[No. 27361.   Department Two.   March 15, 1939.]

PAUL C. HARPER, *Individually and as Trustee, Respondent,* v. THE REED INSTITUTE *et al., Appellants,* OREGON-WASHINGTON BRIDGE COMPANY, *Respondent.*[1]

[1]Reported in 88 P. (2d) 390.

*Wright, Jones & Bronson, W. L. Grill, Wilkinson & Langsdorf,* and *Berkey & Cowan,* for appellants.

*Donworth, Paul & Donworth,* for respondent Harper.

*Rummens & Griffin,* for respondent Oregon-Washington Bridge Company.

GERAGHTY, J.—The plaintiff, as trustee under a mortgage and deed of trust executed by the Oregon-Washington Bridge Company to secure an issue of its bonds, instituted this action, naming as defendants the bridge company and certain of the holders of its bonds, to have the court ascertain and declare the rights, duties, and responsibilities of the parties in respect of a trust fund in his possession. The facts material to the issues may be summarized as follows:

The bridge company, in 1923, executed its mortgage and trust deed, in favor of the plaintiff as trustee, to secure payment of an issue of bonds in the sum of three hundred thousand dollars. The money realized from sale of the bonds was to be used in the construction of a toll bridge across the Columbia river from a point near the town of Hood River, in Oregon, to the town of White Salmon, on the Washington side. Under the mortgage and deed of trust, this bridge and certain lands on either side of the river were pledged for payment of the indebtedness evidenced by the bonds. The bridge was opened to traffic in December, 1924, and has since been in use.

In the latter part of 1933, the Federal government determined to construct a dam across the Columbia river at Bonneville, down stream from the bridge. As planned, the dam would raise the mean low water level

of the river, at the site of the bridge, to a height of twenty-seven feet above the normal flow. The raising of the water level to this height would, as testified by the president of the bridge company, have the effect

" . . . of applying ice pressure against the piers twenty-seven feet higher, of course; but in effect it practically doubled the lever arm, tending to overturn the piers, and there are conditions where ice pressure becomes very severe. . . . Now, with that contact or pressure being applied twenty-seven feet higher, the piers didn't have the stability to stand up to that sort of treatment without reenforcement or strengthening."

Construction of the Bonneville project was in charge of the war department, the department's immediate representatives on the work being Colonel Robbins, division engineer, and Lieutenant-colonel Williams, district engineer. The company sought a settlement with the government for the damage that would result to the bridge by reason of the elevation of the water level, and negotiations were carried on with the army engineers in charge for a period of three years.

Throughout the negotiations, the war department maintained the position that the Bonneville project was primarily one in the interest of navigation, the production of power being only an incidental feature; that, under the paramount power possessed by Congress over navigable waters, the level of the river could be raised without obligation on the government to compensate the bridge company for resulting damage, except in so far as its lands above the normal high water mark were affected by overflow; and that the government would pay only for necessary overflow easements and the cost of raising the approach roadways necessitated by the higher water level.

But while formally maintaining this position, the army engineers seemed to have felt that the bridge

company should be made whole for the cost of making the additions and repairs to the bridge necessitated by the altered flow of the river, especially so as it was deemed desirable that the bridge should be maintained in use for the accommodation of the public. Accordingly, an agreement was reached in the fall of 1936 for payment to the bridge company of $252,831, the money to be spent in making the additions, repairs, and alterations deemed necessary by all parties to make the bridge serviceable and safe under the changed conditions. The president of the company testified that, after the army engineers had agreed to the payment of two hundred and fifty thousand dollars for damage to the bridge, he urged that a further allowance be made for overflow easements; and that the engineers agreed to pay the additional sum of $2,831 for the easements, being at the rate of one hundred dollars an acre for the 28.31 acres affected, thus increasing the total to $252,831.

After the understanding was had as to the amount to be paid by the government, a question arose as to the procedure to be followed in carrying the agreement into effect. As the representatives of the war department did not wish, in terms, to recede from their position respecting the government's nonliability for damage to the bridge, it was agreed, tentatively at least, that the government should institute condemnation proceedings for the acquisition of the right to overflow the company's lands, and that a consent decree be entered. But, when this plan was brought to the attention of the assistant attorney general in charge of legal matters affecting the Bonneville project, he vetoed the suggestion because, as he testified at the trial,

" . . . as far as the legal department was concerned, there wasn't anybody wanted to risk their

reputation on entering into that kind of stipulation, and for that reason it was not carried out. . . . I didn't know of any member of the legal department who desired to enter into a stipulation saying that the amount of damage which the plaintiff,—that the Bridge company would suffer by reason of taking these two flowage easements was more than a quarter million dollars."

The procedure ultimately adopted was the conveyance to the government by the bridge company of flowage rights over its lands for the agreed sum. Two conveyances were executed by the company, one covering flowage rights over two acres on the Oregon side, for a stated consideration of $23,874; the other conveying flowage rights over 26.31 acres on the Washington side, for a stated consideration of $228,957.

The company's conveyances, executed November 21, 1936, in addition to granting "the full and perpetual right, power, privilege and easement to overflow, as hereinbefore stated, all of the following described lands . . ." (the lands described being above the mean high water line existing before construction of the dam) contained the following provision:

"And the said Grantor, in consideration of the above specified sum, also hereby releases the Government from all claims for damages that have accrued or may hereafter accrue to it by reason of the construction, maintenance and operation of the Bonneville Dam, except any claims (whether valid or invalid—and the Government does not recognize the validity of any such claims) that may hereafter be presented for the cost of altering its bridge to provide such clearance for sea-going vessels as the Government may hereafter require."

It may be said here, parenthetically, that later, as the repair of the bridge progressed, the government assumed the expense incurred in making such altera-

tions to the bridge as were required to give clearance to sea-going vessels.

While the company's conveyances, as well as a release by the trustee of the flowage rights from the lien of the mortgage, were delivered to the government, the consideration was not immediately paid, but was withheld pending compliance by the company with certain requirements of the government. October 22, 1936, Colonel Williams addressed a letter to the bridge company, saying in part:

" . . . and upon approval of the transaction by the bondholders, execution by the Bridge Company of the modified easements, release of the property from the trust deed, furnishing satisfactory assurance that the money paid by the Government will be used in revising the bridge so as to conform to the flowage conditions resulting from the construction of the Bonneville Dam, approval of titles by the Attorney General, the consideration for said flowage easements will be paid.

" . . . It would be preferable, if the consent of the bondholders were obtained, the release executed by the trustee, the flowage easements executed by the Bridge Company, and satisfactory assurance furnished that necessary revision of the bridge would be made, to submit the transaction in complete form to the Attorney General."

The assurance required, that the money would be spent on the bridge, was given in a letter addressed to the war department December 2, 1936, by the president of the company, as follows:

"Assurance is hereby given that the $252,831 to be paid this Company will be expended upon alterations and reconstruction of our bridge, as far as that amount will go, in the following manner:

"(1) Two additional concrete piers carried to bedrock on the Washington side.

"(2) Three additional piers of concrete on the Oregon side, one to bedrock and two on piles.

"(3) Five additional steel spans.

"(4) Reconstructing both timber approaches to a higher grade line.

"(5) Raising the tops of two existing piers on the Washington side and jacking up two existing steel spans to a higher grade line.

"(6) Fill and surfacing our Oregon approach highway.

"(7) Reinforcing six of the existing concrete piers.

"By authorization of the Board of Directors."

The assistant attorney general's examination of title to the company's property disclosed that it was subject to the lien of the mortgage and deed of trust, which contained a provision authorizing the company to dispose of any of its property subject to the lien, the use of which, in the opinion of its directors, was no longer necessary or advantageous to its business, but the proceeds of any such sale were required to be paid to the trustee and used by him for retirement of bonds in the inverse of their numerical order.

This provision was brought to the attention of Colonel Williams, and he required, as we have seen, consent of the bondholders to application of the money paid by the government to the revision of the bridge, and, also, that the trustee release the flowage rights from the lien of the mortgage. The trustee was also concerned, for his own protection, that the bondholders give their consent to this application of the money. Accordingly, he addressed letters to the bondholders, informing them of the status of the company's affairs, the necessity for spending the whole of the money received from the government in reconditioning the bridge, and requested signatures to a consent to that effect.

Of the original issue of three hundred thousand dollars, bonds in the amount of $199,000 were outstanding

and unpaid, with interest in default for some years. Holders of bonds in the amount of $166,600 signed consents, but the holders of bonds aggregating $32,400 failed to sign. To meet this condition, the assistant attorney general required the trustee to submit an affidavit detailing the amount of the outstanding bonds, the names of the holders who had signed consents, and the number and amount of bonds held by holders not consenting. He required, also, that the trustee's affidavit embody the following statement:

. "That it is understood and agreed by and between the Oregon-Washington Bridge Company and myself, as Trustee as aforesaid, that the amount received from the Government for flowage easements shall be received from the Government and receipted for jointly by the Oregon-Washington Bridge Company and Paul C. Harper, Trustee; and that after the receipt of said money I, as such Trustee, will retain in my possession a sufficient amount of money to make settlement with such bondholders as have not joined in the consent, as heretofore stated."

This affidavit was supplied by the trustee, and, in accordance with the arrangement it embodied, the money was paid by the government and jointly receipted for by the company and trustee. The trustee retained $46,066.36, being the fund involved in the present controversy, receipting therefor as follows:

"RECEIVED OF OREGON-WASHINGTON BRIDGE COMPANY by the undersigned as Trustee the sum of forty-six thousand sixty-six and 36/100 dollars ($46,066.36) to be retained by said Trustee and to be used (or so much thereof as may be necessary) to make settlement with such bondholders as shall not have joined in authorizing said Trustee to pay said Oregon-Washington Bridge Company all funds received from the United States of America for the alteration, reconstruction or change of the physical properties of said company."

In his complaint, the plaintiff details the transactions leading up to the deposit with him of the fund in controversy. He alleges that the only source of revenue available to the bridge company to pay interest and the principal on its bonds, is the revenue derived from the operation of the toll bridge; that, if the trustee had not released the flowage easements from the lien of the mortgage and deed of trust, the government would have paid no compensation to the company for damage to the bridge; and that, if reconstruction had not been accomplished before the raising of the water level, the lien of the bondholders would have been of little or no value.

It is alleged that the plaintiff is informed and believes that the company has expended practically all of the money retained by it out of the sum paid by the government in the reconstruction and alteration of the bridge; and that the company is now in need of the $46,066.36 held by him to complete the work of alteration and construction.

The bridge company answered, and, by way of affirmative defense, alleged that the government allocated to it the sum of $252,831 upon the express and agreed condition that the money would be spent upon alterations and reconstruction of the bridge, so far as that sum would go, and, specifically, that the money would be used in the manner specified in the letter of December 2, 1936, addressed to the war department, already quoted; and that the expenditure of the fund for this purpose would be for the protection and benefit of all bondholders under the mortgage.

Reference is made to recitals in the mortgage that it is executed

" ' . . . for the equal pro rata benefit and security of all the holders of any of the hereinafter mentioned

bonds, without preference or priority of one bond over another' ";

and that

" ' . . . all bonds issued hereunder shall, when certified to by the said Trustee, be in all respects equally and ratably secured herewith without preference, priority or discrimination.' "

It is alleged that to permit any of the nonconsenting bondholders to share in the fund retained by the trustee would violate the terms of the mortgage, both upon the part of the trustee and of the company; that, by the terms of the mortgage, the company was required, at its own cost and expense, to

" ' . . . cause to be done all things necessary to preserve and to keep in full force and effect all its rights and privileges, and shall and will diligently preserve all rights and privileges to it granted and on it conferred by law or otherwise, . . .' "

and

" 'Will not knowingly do or suffer any matter or thing whatsoever whereby the indebtedness evidenced by the bonds, or the security therefor, might or could be lost or impaired.' "

It is alleged that the company had expended, as of January 31, 1938, for necessary alterations and reconstruction, the sum of $295,088.19; that of this expenditure the defendant had been reimbursed by the Federal government in the sum of $76,848.83, on account of navigation alterations, leaving a net outlay by the company, as of the date mentioned, of $218,239.36; that to complete the alterations and improvements called for by its agreement with the government will require the expenditure by the company of an additional one hundred thousand dollars; and that the fund in the hands of the trustee is required by the company to complete the alterations contemplated and required by the

government and to maintain the bridge as a public utility, thereby protecting every bondholder equally and ratably under the law.

The other defendants, nonconsenting bondholders, by way of affirmative defense and cross-complaint, alleged that all of the sum received by the bridge company was paid by the government for the flowage easements; that of the sum so received there was paid to the plaintiff the fund in controversy upon the express understanding and agreement between the government and the trustee and bridge company that the fund would be used for the retirement of the bonds held by the nonconsenting bondholders; and that such bondholders are entitled to payment of the bonds not alone out of the fund held by the trustee by reason of express contract with the government, but also out of the funds received by the company for flowage easements, in accordance with the terms of the mortgage.

It is alleged that the earnings of the bridge company for a number of years have been wholly insufficient to pay the cost of operation and interest upon the bonds, and that the future earnings of the reconstructed bridge would be insufficient for that purpose; that the market value of the bonds for the last several years has been only a small fraction of their par value, and that it would be inequitable, unjust, and unfair, and without warrant in law to permit the trustee to apply the funds in his hands toward the alteration and reconstruction of the bridge.

The prayer is that they recover from the trustee the amount due them, being the face of the bonds with interest from the date of maturity at the rate of ten per cent per annum.

At the close of the trial, the court made findings of fact and conclusions of law favorable to the contentions of the plaintiff and the defendant bridge company, find-

ing as facts that, of the $252,831 paid by the government to the bridge company, the sum of $250,000 constituted damages to the bridge structure and represented the cost, as estimated by the government, of making the agreed alterations to the bridge; and that the sum of $2,831 represented the appraised value of the overflow rights conveyed to the government; that the government, orally and in writing, required the company to give written assurance that the full consideration paid to it would be spent upon the alteration, reconstruction, or change of the physical properties of the toll bridge, and that such assurance was given.

The court found that the company had spent practically all of the funds received by it from the government in the reconstruction and alteration of its bridge, as requested, and that, in order to complete the work, the company is in need of the fund in the possession of the trustee, and that the cost of completing the required work on the bridge will exceed the fund held by the trustee by at least thirty thousand dollars. It was found that, after conveyance of the flowage easements, the bridge company continued to be the owner of all property at any time theretofore owned by it, used or useful in the construction, maintenance, and operation of the toll bridge, and that the trustee still possesses a lien on all such property; and that the shore lands of the company are as valuable now as they were before the granting of the flowage easements.

From the facts found by the court, it concluded that the defendants, nonconsenting bondholders, were entitled to have distributed to them their proportionate shares of $2,831, the value of the flowage easements conveyed by the company to the government, and that the remainder of the fund in the hands of the trustee be used in the alteration and reconstruction of the

physical properties of the bridge company, as required by the government.

From a judgment entered upon the findings and conclusions, this appeal is taken by the defendants other than the bridge company.

The appellants first contend that the agreement for retention of the fund by the trustee was made for their benefit; and that, by its terms, they are entitled to payment of their bonds out of the fund.

The trial court found that the government and the trustee required the retention of the fund for their own protection. The trustee required security against the possible claims of the bondholders, under provisions of the trust deed, before executing a release of the flowage easements. That its own protection against claims of the bondholders affecting its flowage easements, was the primary purpose of the government, and that it was not assuming guardianship of the interest of the bondholders, is evidenced by its course of dealing. Although it was paying more than enough to satisfy all of the outstanding bonds, it was content to have the bondholders waive their rights to payment in order that the money might be available for reconditioning of the bridge. It was only after eighty-three per cent of the bondholders had signed consents that it required the retention of sufficient funds "to make settlement" with those who did not consent. This is reflected in the testimony of the assistant attorney general in charge:

"Q. When did you become interested in paying the bondholders on this property? A. In paying the bondholders? Q. Yes, with Government money. A. I didn't know that the bondholders were entitled to the money received for the sale of any mortgaged property until the early part of September, 1936. And at that time,—I wouldn't say I was interested in paying the bondholders. I was interested in seeing that this matter

was closed up in a legal way in such a manner that the Government would not involve itself in litigations. Q. In other words, you were interested in getting the money that had been agreed upon, out of the hands of the Government, and the Government cleared from any possibility of recapture or suit as far as the transaction was concerned? A. That was it, sir."

The meaning of the phrase "to make settlement" is dependent upon the circumstances and relation in which it is used. Here, the phrase must be held to mean a settlement with the nonconsenting bondholders in accordance with their rights under the mortgage and deed of trust. This instrument provided:

"Upon request of the Company, the Trustee from time to time, subject to the conditions and limitations herein set forth, shall release from the lien and operation of this indenture any property which shall be subject to the lien of this indenture, then owned by the Company, the use of which, in the opinion of its board of directors, is no longer necessary or advantageous in the business of the Company and the sale or disposition of which, in the opinion of said board of directors, has become necessary or expedient; . . ."

After detailing certain formalities to be followed in the sale or exchange of property covered by the mortgage lien, but no longer necessary or advantageous in the business of the company, it is further provided:

"All monies received by the Trustee on any and all sales or exchange, as herein provided, shall be used so far as possible for retirement of bonds in the inverse of their numerical order, as in this indenture provided."

These provisions measure the bondholders' rights to payment out of the fund received from the government. The court's finding that, of the sum paid, only $2,831 was for overflow easements, is fully supported by the evidence. The only thing conveyed by the company that could be construed to be within the terms of the

quoted provision of the mortgage was the right to over-flow the company's riparian lands.

On this view, the appellants, standing upon their legal rights under the mortgage, could assert a claim only to the extent of participation in the sum paid for the easements. This conclusion is reinforced by con-sideration of the fact that the primary purpose of the settlement was to make the company whole by pay-ing to it sufficient funds to so recondition the bridge as to insure its future usefulness. This would involve the use of all the money paid, although, as it later developed, some of it might be required to satisfy the rights of nonconsenting bondholders growing out of the terms of the mortgage.

The appellants next contend that they are en-titled to full payment under the express language of the mortgage and trust deed.

This contention would seem to be fully answered by what we have already said. The only provision in that instrument relating to the disposition of the com-pany's property and payment of the proceeds to the bondholders, is the one to which we have already re-ferred, and that relates only to conveyances made by the company of property subject to the lien, "the use of which, in the opinion of its board of directors, is no longer necessary or advantageous in the business of the Company. . . ."

The right to damage and possibly destroy the bridge can hardly be classified as within this provision. In-deed, as alleged in its affirmative answer, the company is required by the mortgage, at its own cost and ex-pense, to cause to be done all things necessary to pre-serve and keep in full force and effect all of its rights and privileges, and not to

". . . knowingly do or suffer any matter or thing whatsoever whereby the indebtedness evidenced by

the bonds, or the security therefor, might or could be lost or impaired."

Furthermore, as we have seen, the express condition upon which payment was made by the government was that the money should be used in reconditioning the bridge, so that no final damage would result to the company or its bondholders by reason of the government's operations, and that the public would have the continued use of a serviceable connection between the highway systems of the two states bordering upon the river.

While the considerations influencing the government in requiring the reconditioning and retention of the bridge is to be primarily inferred from what was done, it is not unreasonable to assume that there must have been in the minds of its responsible agents the wish not to destroy by the navigation project an existing utility in daily use by the traveling public.

Finally, the appellants contend that they are entitled to payment of their bonds because of the complete destruction of their mortgaged security.

A sufficient answer to this contention is the fact that the bridge was not destroyed, but, on the contrary, in accordance with the agreement with the government, reconditioned so that it will be as serviceable in the future as in the past, thereby preserving the property pledged as security for the bonds. *Seattle Sav. & Loan Ass'n v. King County,* 189 Wash. 563, 65 P. (2d) 1274, and other cases cited by the appellants, are not applicable here, because, as respects the bridge, there was no such taking or impairment of the security as was present in those cases.

The judgment is affirmed.

BLAKE, C. J., BEALS, MILLARD, and SIMPSON, JJ., concur.